IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DANIEL A. UMBERT                   )
15575 SW 17TH Street            )
Weston, FL 33326              ) Civil Action No.: <u>18-1336-TSC</u>
                                     )
TROY BRENT CHODOSH        ) FIRST AMENDED COMPLAINT
6133 Orangewood Drive        )
Corpus Christie, TX 78412     )
                                     )
ERROLL ALEXANDER EATON   )
2236 Southwood Road         )
Jackson, MS 39211            )
                                     )
CHASE W. BICKEL            )
3515 Firethorn Drive         )
Whitestown, IN 46075       )
                                     )
GARY JAMES LECOMTE       )
5531 Market Road             )
Marsing, ID 83639            )
                                     )
JUSTIN LANE BARGERON     )
132 Huger Street             )
Rincon, GA 31326           )
                                     )
KEVIN FRANCISCO BORQUEZ  )
Post Office Box 113          )
Pine Bluffs, WY  82082       )
                                     )
CHARLES EDWARD STEWART   )
10909 S. Quebec Place        )
Tulsa, OK 74137             )
                                     )
       Plaintiffs,             )
                                     )
       v.                      )
                                     )
UNITED STATES OF AMERICA   )
C/O Office of the Attorney General  )

950 Pennsylvania Avenue, NW     )
Washington, DC 20530-0001    )
                                  )
     and                        )
                                  )
JEFFERSON SESSIONS, in his official   )
Capacity as Attorney General     )
Office of the Attorney General    )
950 Pennsylvania Avenue, NW     )
Washington, DC 20530-0001    )
                                  )
     and                        )
                                  )
FEDERAL BUREAU OF INVESTIGATION)
J. Edgar Hoover Building       )
935 Pennsylvania Avenue, N.W.    )
Washington, D.C. 20535       )
                                  )
     Defendants.             )
_____)

---

## FIRST AMENDED COMPLAINT

---

   **COME NOW** the Plaintiffs, by and through undersigned counsel, and allege as follows:

### PARTIES

1.  Plaintiff Daniel A. Umbert ("Umbert") is an adult male citizen of the State of Florida and is a duly licensed attorney by the State Bar of Florida.

2.  Plaintiff Troy Brent Chodosh "(Chodosh") is an adult male citizen of the State of Texas.

2

3.   Plaintiff Errol Alexander Eaton ("Eaton") is an adult male citizen of the State of Mississippi.

4.   Plaintiff Chase W. Bickel ("Bickel") is an adult male citizen of the State of Indiana.

5.   Plaintiff Gary James LeComte ("LeComte") is an adult male citizen of the State of Idaho.

6.   Plaintiff Justin Lane Bargeron ("Bargeron") is an adult male citizen of the State of Georgia.

7.   Plaintiff Kevin Franscisco Borquez ("Borquez)" is an adult male citizen of the State of Wyoming.

8.   Plaintiff Dr. Charles Edward Stewart ("Stewart") is an adult male citizen of the State of Oklahoma.

9.   Defendant United States of America ("USA") is a jural entity and a proper defendant under 18 USC § 925A.

10. Defendant Jefferson Sessions is sued in his official capacity as the Attorney General of the United States of America.   As Attorney General, Defendant Sessions is responsible for administering and executing the laws, customs, practices and policies of the United States, and is currently enforcing the laws, customs, practices and policies complained of in this action.

11. Defendant Federal Bureau of Investigation is sued as the entity that oversees and conducts the National Instant Criminal Background Check System

("NICS") and is responsible for enforcing the laws, customs, practices and policies complained of in this action.

## JURISDICTION AND VENUE

12. This Court has jurisdiction of this matter pursuant to 28 U.S.C. §§1331, 1343, 1346, 2201, 2202; 18 U.S.C. §925A; and 42 U.S.C. §1983 and §1988, since the United States and the Federal Bureau of Investigation are Defendants and the case arises under the Constitution and laws of the United States.

13. Venue is proper under 28 U.S.C. §1391.

## STATEMENT OF FACTS

### a.    Applicable Law

14.  18 U.S.C. §922(g)(1) provides that:

> "It shall be unlawful for any person-- (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
>
> ***
>
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

15. 18 U.S.C. §921(a)(20) provides that:

> The term "crime punishable by imprisonment for a term exceeding one year" does not include—
>
> (A) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or

(B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.

What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. **Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.**   (emphasis added).

16.  The vast majority of firearms are purchased through Federally Firearm Licensees ("FFL").

17. FFLs are required to preform a background check via the National Instant Criminal Background Check System ("NICS") prior to selling a firearm to an individual

18.  FFLs are unable to sell to individuals who fail a background check.

19. Prior to October 23rd, 2015 individuals who received a denial from NICS could file an appeal with the FBI.

20. After October 23rd, 2015, the FBI stopped processing appeals despite still being authorized to process them.

21. Individuals who wish to purchase suppressors or other National Firearms Act ("NFA") regulated items are required by federal law to pass a NICS check during the background check stage.

22. Individuals who wish to purchase a firearm may do so by private transfer.

23. However, it is illegal under federal law for a person to sell a firearm to a prohibited person.

24. It is customary for private sellers to inquire as to whether a person is prohibited in order to avoid criminal liability.

25. Thus, it is virtually impossible to lawfully purchase a firearm if a person is deemed prohibited by the FBI even if the FBI is incorrect.

26. Upon information and belief, Plaintiffs believe that there is a high chance of erroneous denials and many thousands of persons are currently wrongful denied.

27. Judge Richard Mark Gergel presided over the first case to conduct discovery on NICS. The United States District Court for the District of South Carolina Charleston Division recently published its findings in *Sanders v. United States,* Civil Action No. 2:16-2356-RMG, 2018 U.S. Dist. LEXIS 101423 (D.S.C. June 18, 2018).

28. That action and fifteen other related actions were filed by "surviving victims and the estates of deceased victims who suffered injury or death at the hands of Dylan Roof when he entered a bible study group at Emanuel A.M.E. Church on June 17, 2015 and murdered nine persons with a Glock Model 41 pistol. Under federal law, Roof's narcotics arrest on February 28, 2015, disqualified him from receiving a firearm. Nevertheless, he was able to purchase the Glock pistol from a federally licensed firearms dealer on April 11, 2015

because the [FBI's NICS] failed to discover Roof's disqualifying arrest record".
*Id* *1.

29. "Notably the NICS examiners are denied access to the FBI-administered
N-DEx system, a comprehensive federal database created 9/11 that contains
over 500 million criminal justice records. This database includes incident and
arrest records, booking reports, pretrial investigations, supervised release reports,
photos and identifications records." *Id.* At *10.

30. The Court found that "[a] simple Google search would have produced
the contact information for the Columbia Police Department. But the NICS
SOPs did not address this potential situation and NICS practice prohibited any
general internet search." *Id.* At * 16.

31. The Court "[t]he fault here [in not denying Dylan Roof] lies in abysmally
poor policy choices made regarding the operation of the NICS. The most
obvious of these poor policy choices was the decision to deny the examiners
access to the most comprehensive federal criminal justice database, N-DEx." *Id*
at * 17.

32. And further found that the Government's rationale in denying its
examiners from having access to the database "simple nonsense". *Id* at * 17.

33. While the Court could not find liability under the Federal Tort Claims
Act the Court still opined that "perhaps the FBI, learning fully the detail of the

failure of its system in this tragic series of event, will promptly take corrective steps to prevent a similar failure of the system". *Id* at * 20-21.

34. Thus, Defendants are on notice as to the many errors in their system yet take no action to correct their procedures.

35. On information and belief, Plaintiffs believe giving NICS examiners access to the N-DEx would make the odds of erroneous denials go down dramatically.  This is because NICS examiners would have a full record to determine when a crime occurred and (in the case of similarly named people) who had committed the crime and whether the crime had been expunged.

36. Providing access to this database would be a minimal burden to Defendants because as Judge Gergel observed, the N-DEx is located in the same building as the NICS.

37. Processing appeals would also be a minimal burden upon Defendants.

**b.        Suppressors**

38. There are more than 1.7 million suppressors owned by private citizen in the United States.

39. Suppressors are a set of empty baffles that attach to the front of a firearm to suppress the report of the firearms to levels that are not harmful or less-harmful to human hearing.

40. They do not "silence" a firearm as seen in the movies.

41. They are legal in approximately forty-two states.

42. The Second Amendment applies to all items which are in common use for self-defense. *See Heller v District of Colombia,* U.S. App. D.C. 314, 679 F 3d 1244 (2011).

43. This principle applies to items such as magazines that are useful to self-defense even though they fail the definition of an "arm." *Id.*

44. The D.C. Circuit has found that AR-15s are in common use by private citizens for lawful purposes.

45. The Second Circuit has found that AR-15s are in common use because "four million units of a single assault weapon, the popular AR–15, have been manufactured between 1986 and March 2013". *See New York State Rifle & Pistol Ass'n, Inc. v. Cuomo* ("NYSRPA"), 804 F.3d 242, 254 (2d Cir. 2015).

46. Similarly, suppressors are in common use typically used for lawful purposes. Thus, they are afforded Second Amendment protection.

47. Suppressors can be attached to firearm at all times.

48. In a self-defense scenario, it is generally infeasible to take the time to put on hearing protection.

49. Hearing protection makes it more difficult to ascertain the location of a home invader.

50. Thus, a suppressed firearm is the better option for home defense.

51. One of the core rights protected by the Second Amendment is the lawful purpose of self-defense.

52. Training with a firearm is part of that core right. *See Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011).

53. When defending oneself with a handgun in a confined area such as a house, it is common to suffer temporary deafness due to the sound a firearm makes in an enclosed space.

54. A suppressor muffles the sound a firearm makes in an enclosed space to levels that will not deafen a person and lead to permanent hearing loss.

55. Additionally, firearms training can cause permanent hearing loss over time.

56. Suppressors alleviate this risk by reducing the sound a firearm produces to levels that are not harmful or less-harmful to human hearing.

57. Suppressors are regulated under the NFA and defined as a firearm.  In order to purchase a suppressor, first it must be legal in the state where the plaintiff resides.

58. Eaton, Umbert, Bargeron and Borquez all reside in states where suppressor ownership is legal as long as the ownership complies with federal law (i.e., approved by the ATF and registered in the National Firearms Registration and Transfer Record).

59. A prospective suppressor purchaser must then file an application on ATF Form 5320.4 (commonly referred to as a Form 4[1]), answer a number of questions regarding whether the person is a prohibited person, affix a photograph of themselves, and submit fingerprints to the ATF.

60. These applications can take anywhere from 8 months to over a year to approve and transfer the suppressor (or other NFA-regulated firearm) to the applicant.

61. The FBI conducts the background checks for the ATF with respect to a Form 4 application.  There is no lawful way to transfer a suppressor to an individual without submitting the Form 4 and submitting to a background check by FBI NICS.  In other words, Plaintiffs Eaton, Umbert, Bargeron and Borquez could not purchase a suppressor from an individual without having to go through the process of filing all necessary forms with the ATF, waiting the unreasonable amount of time it takes to review the application, and receiving a background check through FBI NICS, and then (hopefully) approval from ATF.

62. After the denial, the Plaintiffs Eaton, Umbert, Bargeron and Borquez are now left with having waited an unreasonable period of time with their application being processed and then denied.

---

[1] This Form 4 is available on the ATF's website, found at:
https://www.atf.gov/firearms/docs/form/form-4-application-tax-paid-transfer-and-registration-firearm-atf-form-53204/download

63. However, it has just been recently discovered that the FBI will <u>not</u> process appeals for NFA background checks, even though it is the FBI that utilized its systems and databases to form the basis of the NFA denial.

64. Now, with the current position of the FBI to completely bar any appeal for a disapproved NFA item, Plaintiffs Eaton, Umbert, Bargeron and Borquez (and all others similarly situated) are left with no remedy.  As such, this violates Plaintiffs Eaton's, Umbert's, Bargeron's and Borquez's (and all others similarly situated) due process rights.

### c.        Capable of Evading Review

65. This Court is allowed to retain jurisdiction of a case if it is capable of repetition and evading review even if the underlying events which give rise to the case and controversy is later mooted. *Del Monte Fresh Produce Co. v United States* 386 App. D.C. 406, 570 F 3d 316 (2009).

66. Under the capable of repetition yet evading review exception to mootness, the plaintiff must demonstrate that "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Clarke v. United States,* 915 F.2d 699, 704, 286 U.S. App. D.C. 256 (D.C. Cir. 1990) (en banc) (quoting *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S. Ct. 1181, 71 L. Ed. 2d 353 (1982)) (alteration in original); *see also Honig v. Doe,* 484 U.S. 305, 318-20, 108 S. Ct. 592, 98 L. Ed. 2d 686 & n.6 (1988).

67. Here, it is Plaintiffs belief that Defendants will attempt to moot this case by correcting Plaintiffs records at the onset of litigation. As fully described below, that is what occurred in several prior cases.

68. If that event occurs, Plaintiffs request that this Court retain jurisdiction of this matter.

69. Plaintiffs' challenge will not be moot where it seeks declaratory relief as to an ongoing policy. *City of Houston, Tex. v. Dep't of Housing & Urban Dev.,* 24 F.3d 1421, 1429-30, 306 U.S. App. D.C. 313 (D.C. Cir. 1994). In *Super Tire Engineering v. McCorkle,* 416 U.S. 115, 125, 94 S. Ct. 1694, 40 L. Ed. 2d 1 (1974), the Supreme Court held that although a claim for injunctive relief preventing payment of welfare benefits during a strike was moot because the strike had ended, the employers' request for declaratory relief was not moot because the state's ongoing policy of paying strike benefits was, on the employers' theory of the case, "immediately and directly injurious to the [employers'] economic positions."

70. Here, Plaintiffs challenge is to Defendants ongoing policy whereby it does not process NICS appeals.

71. Under 28 C.F.R. § 25.10, the FBI has an obligation to verify the record correction with the originating agency and take all necessary steps to correct the record in NICS. This is not a discretionary duty.

72. However, the Defendants and the FBI in particular is improperly shifting their burden to the individual to follow up with various courts or jurisdictions. This is the same scenario found in *Ross v. Fed. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 903 F. Supp. 2d 333, 341 (D. Md. 2012). In *Ross*, the district court found that the defendant was improperly shifting the burden and that:

> [t]he regulations make clear that the burden falls on the NICS Section to conduct additional research "to determine whether the prospective transferee is disqualified from possessing a firearm by Federal or state law." 28 C.F.R. § 25.6(c)(1). The NICS Section has three business days to ascertain whether a buyer's criminal record bars receipt of a firearm, and if it is unable to make a final decision, the FFL can transfer the firearm to the purchaser.

*Id.* at fn. 13.

73. This has been an ongoing issue with Defendants and they have been on notice as early as May 8, 2016 when the case *Gregory Michael Ledet v. USA*, in the United States District Court for the District of Columbia, Civil Action No. 1:16-cv-00865-ABJ was filed. Since that case, four others were filed: *Robert Boyd Rood v. USA*, in the United States District Court for the District of Columbia, Civil Action No. 1:17-cv-00839-KBJ; *Robert Earl Rowe v. USA*, in the United States District Court for the District of Columbia, Civil Action No. 1:16-cv-01510-APM; and *Charles Norfleet Hughes v. USA*, in the United States District Court for the District of Columbia, Civil Action No. 1:16-cv-01425-APM.

74. All the aforementioned cases were filed and then quickly the government defendant(s) "voluntarily" provided the relief sought in the actions. All five

plaintiffs in those cases were granted their certificates to purchase their firearms. This essentially mooted those cases, yet it is apparent that the issues underlying the present action are evading review and are repeating day in and day out.

75. Defendants are denying Plaintiffs their Second Amendment rights. There are no bases for Defendants to deny Plaintiffs their firearms and their Second Amendment rights.

76. On January 20, 2016, USA Today reported that the FBI is halting "the processing of thousands of appeals from prospective buyers whose firearm purchase attempts have been denied."[2]

77. Pursuant to a Freedom of Information Act request made in April 2016, the FBI finally provided documents confirming that it in fact stopped processing appeals and "Incoming Appeal Mail will not be processed." See Exhibit "1".

78. In this production under FOIA, many emails referencing the stoppage are included. For instance, one heavily redacted email states "The AST has five business days to tell a denied individual the reason for their denial. However, the AST Examiners are not performing any appeal work due to the increased volume." *Id.* This email is dated December 17, 2015.

79. On January 13, 2016, another email stated, "We stopped processing front-end mail on 11/25/2015." *Id.*

---

[2] http://www.usatoday.com/story/news/nation/2016/01/19/fbi-guns-background-checks/78752774/?siteID=je6NUbpObpQ-BbTAhOhBe3xFjZr6NOLwLQ

80. This document production also references the FBI's procedure for verifying records by using fax machines and making one attempt to retrieve records.

81. A NICS team member is only required to make one request for a record. If the agency or court does not respond to the NICS team member's fax, then the NICS member has no further requirement under the NICS procedures to do anything.

82. There are also instructions to <u>not</u> request documents from courts if that court charges for documents.

83. This leaves Plaintiffs and all others similarly situated with an inadequate remedy to have their issues resolved without resorting to the courts.

84. Defendants' refusal to process Plaintiffs NICS appeals infringes upon their Second Amendment rights, chills protected activity and violates Plaintiffs' due process rights.

85. Plaintiffs seek declaratory relief (as well as other relief) that this policy violates Plaintiffs Second Amendment rights.

**I.    Plaintiff Daniel A. Umbert**

86. Umbert is a Florida-licensed attorney and is in good standing with the Florida State Bar.

87. Umbert is not a prohibited person.

88. Umbert attempted to purchase a suppressor and submitted a Form 4 to the U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") on or about August 1, 2017.

89. Umbert received correspondence from the ATF on or about March 13, 2018 stating that his transfer of the suppressor he purchased was denied.

90. There is no claim in this letter as to what specifically Umbert was denied for, but instead, he received a form letter reciting the various prohibitory laws and denying Umbert his transfer.  See Exhibit "2".

91. A NICS Transaction Number (NTN) was assigned to Umbert.  The NTN for this specific purchase is 100HTC5GS.

92. Umbert appealed the denial of his purchase, however, the Federal Bureau of Investigation is not actively processing appeals of denial of a firearm transfer.

93. Umbert is not a prohibited person, but now fears that the federal government believes he is somehow prohibited from owning, possession, storing or transferring a firearm.

94. For someone in his position as an active member of the Bar in good standing, an erroneous belief of the federal government that he is a prohibited person could cause significant issues in his life and has chilled his constitutionally protected activity of owning or possessing firearms because he does not want to be falsely arrested and/or prosecuted for enjoying his rights secured by the Second Amendment.

95. The Defendants' actions of denying the transfer infringe on Umbert's Second Amendment right to own and possess firearms, including a suppressor which is defined as a firearm under federal law.

## II.   **Plaintiff Troy Brent Chodosh**

96. Chodosh was arrested on or about October 27, 1999 to possession of over five pounds but less than fifty pounds of marijuana and plead guilty to same. This action was in the 117th District Court of Nueces County, Texas, *The State of Texas v. Troy Chodosh* ,Cause No. 99-CR-3346-B.

97. Chodosh was given deferred adjudication/felony probation and placed on three (3) years of community supervision, assessed a $1,000 fine and court costs of $207.25.  See Exhibit "3".

98. Chodosh was dismissed from community supervision and fulfilled all obligations under his plea agreement.  The court ordered that Chodosh be permitted to withdraw his guilty plea and "the accusation, complaint, information or indictment and all proceedings against [Chodosh] are hereby dismissed; the defendant is hereby released from all penalties and disabilities resulting from the offense or crime to which the defendant has pleaded guilty…" This was entered on or about October 2, 2011.  See Exhibit "4".

99. Chodosh is not a prohibited person as the charge to which he pleaded guilty was deferred and then his guilty plea withdrawn and the case dismissed.

As such, there is no federal or state prohibition on Chodosh owning, possessing, storing or transferring firearms.

100.     Chodosh had purchased a LaRue Tactical[3] rifle and had it shipped to a local Federal Firearm Licensee (FFL) in his state of residence.   Upon attempting to pick up the rifle and after completing the federally required forms, FBI NICS denied Chodosh's transfer erroneously.

101.     After his denial, Chodosh was given NTN 1007MVSX4.

102.     Chodosh appealed the denial on or about April 17, 2017 and has since had no activity on his appeal.

103.     Chodosh, believing that the denial was erroneous, requested a copy of his FBI file, which confirmed that his record demonstrated he received deferred adjudication for his crime, but does not demonstrate that the charge was ultimately dismissed after the successful completely of community supervision.

104.     As such, the FBI's records are erroneous and need to be updated to reflect that Chodosh is not a prohibited person.

105.     Chodosh, even though he knows he is not a prohibited person, fears that the federal government believes that he is a prohibited person and could reasonably attempt to prosecute him for attempting to purchase a firearm.

---

[3] "LaRue is known world-wide for sniper targets, quick-detachable mounting solutions and hyper-accurate 7.62mm and 5.56mm rifle systems."  See https://www.larue.com/.

106.     This is because after a denial, the FBI transmits its denials to ATF Denial Enforcement NICS Intelligence Branch (DENI).  The ATF then submits these denials to various ATF field offices for investigation and prosecution if necessary.

107.     This denial has chilled Chodosh's Second Amendment rights as guaranteed by the Second Amendment and has prevented Chodosh from exercising his rights.

### III.   Plaintiff Chase W. Bickel

108.     In 2005, Bickel was charged with two Class D felonies in Indiana in the matter styled *State v. Chase W. Bickel*, in the Bartholomew Superior Court 1, Cause No. 03D01-0510-FD-001817.

109.     Bickel pleaded guilty to Count I, receiving stolen property, Class D felony, and he was sentenced as a Class A misdemeanor to one year in jail - all suspended.  His sentence was probation.  Count II was also dismissed against him upon the state's motion.

110.     In 2007, the court granted Bickel's motion for modification changing his Class D felony to a Class A misdemeanor.  See Exhibit "5".  In Indiana, a Class A misdemeanor is punishable by up to one year in jail and a fine of up to $5,000. A Class A misdemeanor is not a prohibitory offense for firearms rights.

111.     Bickel has a current License to Carry a Handgun in Indiana and has

passed numerous previous NICS checks.  However, upon a recent attempt to

purchase a firearm, NICS denied Bickel his transfer.

112.     After the denial, NICS provided NTN 100MJLJC1 to Bickel.

113.     Bickel appealed his denial.

114.     Bickel is not a prohibited person as his prior felony conviction was

reduced to a Class A misdemeanor which is not a prohibitory offense. As such,

the FBI erroneously denied Bickel's firearm transfer.

115.     Defendants have chilled Bickel's rights secured to him by the

Second Amendment as they have prevented him from exercising his rights

afforded him by the Second Amendment.

### IV.     Plaintiff Erroll Alexander Eaton

116.     Eaton was found guilty of the charges of Possession of Marijuana

in a Motor vehicle and Possession of False Identification on May 15, 2003.  The

matter was styled *State of Mississippi v. Erroll Alexander Eaton*, in the Municipal

Court of the City of Starkville, Cause Nos. 03-2329 and 03-2331.

117.     On July 10, 2008, the municipal court granted Eaton's motion to

expunge and restored Eaton "in the contemplation of the law, to the status he

occupied before he was arrested on these charges and the affidavit was filed against him." See Exhibit "6"[4].

118.    As Eaton's criminal convictions were expunged, they are a legal nullity and cannot serve as a basis to deny Eaton his constitutional rights preserved by the Second Amendment.

119.    Eaton applied to the ATF on a Form 4 for a suppressor. He filled out all the required paperwork and submitted his tax payment as required.

120.    In May 2018, Eaton's application was "disapproved by ATF based on the FBI reporting a final status of "open" on the required background check after 88 days and have not received information back on the final disposition of potentially prohibiting information." NTN 100J3SDH4 was assigned to Eaton. See Exhibit "7".

121.    The FBI erroneously denied this firearm transfer as Eaton is not a prohibited person.

**V.       Plaintiff Gary James LeComte**

122.    LeComte was denied a transfer of a firearm in June 2015 when he went to retrieve a firearm that he had pawned and then wanted to reclaim out of the pawn shop. The NTN is 2YCWZXK.

---

[4] Certain redactions were made to this document as it contained the social security number of Eaton. If it is necessary to provide unredacted copies, Eaton will do so under seal with approval of this Court.

123.     LeComte filed an appeal and the FBI responded with the attached letter saying he was a prohibited person.  See Exhibit "8."

124.     On April 10, 2018, LeComte received correspondence from the FBI stating that the FBI had resolved some prohibitory information in his record, however, two potential prohibitor(s) still remained.  The FBI then shifted the burden to LeComte to research and provide records to the FBI.

125.     The FBI listed two arrests:  One with the U.S. Yosemite National Park Service for an arrest on January 5, 1975 and one with the Santa Cruz County Sheriff's Office for an arrest on January 6, 1975.  *Id.*

126.     The  FBI  then  directed  LeComte  to  provide  "**court documentation containing the final disposition, level of conviction, and/or convicting statute and subsection; police report or court documentation containing victim information**." *Id.* Further, it instructed LeComte that once he has "obtained **ALL** of the requested documentation listed above, please submit it to our office.  Please be advised, a 'no record found' document is not sufficient documentation and should not be provided." *Id.*

127.     For background, LeComte was arrested on or about January 5, 1975 by a National Park Service Park Ranger for malicious mischief – writing on a public restroom.  LeComte was convicted of malicious mischief and to his recollection, was sentenced to ninety days probation and had to pay a fifty ($50) dollar fine to repaint the bathroom.

128.     This was not a felony conviction.

129.     On January 6, 1975, LeComte was arrested by Capitola Police Department who arrested LeComte on a warrant from Santa Cruz County Sheriff's Office for an assault charge.

130.     LeComte was convicted of a misdemeanor battery after it was reduced from a felony assault.

131.     This conviction is not a prohibitory offense.

132.     The FBI has improperly shifted its burden to LeComte to prove he is not a prohibited person with records which may or may not exist contrary to the FBI's burden of researching and finding these records on its own.  See *Ross v. Fed. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 903 F. Supp. 2d 333, 341 (D. Md. 2012).

133.     LeComte has routinely passed background checks in both California and Idaho and has even held a Class 1 Federal Firearms License in the 1990's.

134.     LeComte is not a prohibited person.

**VI.     Plaintiff Justin Lane Bargeron**

135.     Bargeron was denied a transfer of a firearm (a suppressor) in June 2018 when he filed his Form 4 to transfer a suppressor.  The FBI utilized NICS and claimed that Bargeron failed the background check.  The NTN assigned by the FBI is 100G1RNYM.

24

136.     Bargeron appealed the denial and was advised by the FBI that it does not process appeal requests "for the NFA background checks." See Exhibit "9".

137.     Bargeron has no appeal rights as the FBI will not allow him to appeal the denial, and because the ATF only denied Bargeron's transfer due to the FBI NICS denial, there is no appeal process through the ATF.

138.     For background, Bargeron received an open-ended plea disposition under Georgia's First Offender Act and was sentenced to ten (10) years of probation.  See Exhibit "10".

139.     On September 23, 2016, a Petition for Discharge of defendant [Bargeron] (First Offender Act) was filed by the Assistant Chief Community Supervision Officer.  See Exhibit "11."

140.     This document includes an "Order of Discharge" which states that Bargeron was "placed on probation on the 24th day of September, 2009 for a period of ten (10) years in accordance with the provision of [the Act] without an adjudication of guilt" and that Bargeron was "discharged without court adjudication of guilt" and that "this discharge shall completely exonerate the defendant of any criminal purpose" and that Bargeron "shall not be considered to have a criminal conviction." *Id.*  It was signed by Judge John R. Turner of Bulloch County Superior Court.

141.     As such, Bargeron is not a prohibited person and even holds a valid Georgia Concealed Weapons permit.

**VII.     Plaintiff Kevin Franscisco Borquez**

142.     Borquez had previously been convicted under California penal law 261.5(c), which can either be charged as a misdemeanor or felony. Borquez was charged and convicted of the felony on March 28, 2007.

143.     On March 22, 2010, Borquez filed a Petition for Dismissal which requested that the felony charge be reduced to a misdemeanor. See Exhibit "12." Under PC 261.5(c), the maximum sentence for a misdemeanor is one year in the county jail.

144.     Borquez's petition was granted on April 23, 2010 and the felony was reduced to a misdemeanor and released him "from all penalties and disabilities resulting from the offense except as provided in Penal Code section 12021 and 12021.1… the dismissal does not permit a person to own, possess, or have in his or her control a firearm if prevented by Penal Code sections 12021 or 1201.1" See Exhibit "13."

145.     The aforementioned code sections do not apply to Borquez because he did not commit an offense with a firearm, and therefore, Borquez is not a prohibited person under state or federal law.

146.     Borquez requested from California a firearm eligibility statement and was advised that he is "able to both possess and purchase firearms as of the

date the check was completed." The check was completed on September 16, 2010. See Exhibit "14."

147.     Borquez moved to Wyoming and attempted to transfer various NFA registered items. The FBI denied Borquez's background check through NICS and provided the following NTNs: 100F10B0J (for three items); 100HG4J47; and 100HG4J0W.

148.     Borquez attempted to appeal these denials but was advised by the FBI that NICS "does not process appeal requests for the NFA background checks." See Exhibit "15."

149.     Borquez has no appeal rights as the FBI will not allow him to appeal the denials, and because the ATF only denied Borquez's transfers due to the FBI NICS denial, there is no appeal process through the ATF.

## VIII.   **Plaintiff Charles Edward Stewart**

150.     Plaintiff Stewart is a medical doctor residing in Oklahoma. He has never been convicted of any crime which would dispossess him of his Second Amendment rights.

151.     Stewart purchased a firearm in his home state and was delayed by NICS. After five days, Stewart was allowed to pick up his firearm because he

was not denied.  Stewart purchased another firearm from another FFL dealer that was also delayed.[5]

152.     Shortly thereafter, he was contacted by an agent with the ATF because the government believed Stewart was a prohibited person.  The ATF agent did his due diligence, presumably by contacting the New Jersey court, and determined that Stewart was not a prohibited person.

153.     However, the FBI still believes Stewart to be a prohibited person after Stewart appealed and was provided NTN 100JP9Y18.  The letter states Stewart was prohibited because of what is believed to be a restraining order out of New Jersey, Essex County.  See Exhibit "16."

154.     The letter listed the court where the alleged "prohibiting record" could be located. It was in Essex County Family Court and in a state where Stewart had never resided.  The letter listed that that there was a Date of Protection Order from April 23, 1988 bearing Protection Order Number FV-07-003412-98.

155.     After Stewart was tasked with doing the research on his own, he discovered that the that Protection Order Number does correspond with a "Charles Stewart", but it is not "Charles Edwards Stewart."  The "Charles Stewart" in the New Jersey case is African American and your Plaintiff, Charles

---

[5] This delay was a denial after Stewart completed the transaction.  However, Stewart was never provided with the NTN for this transaction.  Like the first transaction, the ATF agent cleared Stewart on this purchase.  Upon information and belief, this transaction is still in "deny" status at FBI NICS.

Edward Stewart, is Caucasian.[6]  Additionally, Stewart provided his social security number of the NICS appeal, and simple research of driver's licenses would demonstrate that Charles Edward Stewart is not and has never been a resident of New Jersey.

156.     However, given the clear differences in even the basic description of the order, the FBI still considers Stewart prohibited.

157.     Stewart is not a prohibited person and the FBI has again shifted the burden to the Plaintiff to fix the government's error.  Had the FBI simply requested the information itself from the Essex County Family Court, it would have found, and hopefully, fixed the error and cleared Stewart.

## COUNT I - 18 U.S.C. § 925A

158.      Plaintiffs incorporate each previous paragraph as if set forth herein again.

159.     18 U.S.C. § 925A provides

Any person denied a firearm pursuant to subsection (s) or (t) of section 922—

(1) due to the provision of erroneous information relating to the person by any State or political subdivision thereof, or by the national instant criminal background check system established under section 103 of the Brady Handgun Violence Prevention Act; or

---

[6] Both Stewarts have the same date of birth.  However, Charles Stewart is a common name.  At St. Francis Hospital in Tulsa, Oklahoma, there are three Dr. Charles Stewarts who have privileges.  Two of those doctors are Charles E. Stewart.  Given that Charles Stewart is a common name, due diligence requires further research on behalf of the Defendants before denying Second Amendment rights.

(2) who was not prohibited from receipt of a firearm pursuant to subsection (g) or (n) of section 922,

may bring an action against the State or political subdivision responsible for providing the erroneous information, or responsible for denying the transfer, or against the United States, as the case may be, for an order directing that the erroneous information be corrected or that the transfer be approved, as the case may be. In any action under this section, the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs.

160.    Plaintiffs request that orders issue directing that any erroneous information be corrected, and the transfers be approved without delay.

161.    Plaintiffs also request that an order issue directing Defendants to issue Plaintiffs a UPIN (Unique Personal Identification Number) so future transactions, for which delays or denials could reasonably reoccur, would be less likely to do so.

## COUNT II – VIOLATION OF THE SECOND AMENDMENT

162.    Plaintiffs incorporate each previous paragraph as if set forth herein again.

163.    Defendants' conduct burdens Plaintiffs' Second Amendment and all similarly situated individuals' rights as it prohibits them from purchasing firearms in their state of residence.

164.    Defendants' conduct additionally burdens Plaintiffs' Second Amendment rights as Defendants act to arbitrarily and capriciously revoke Plaintiffs Second Amendment rights without due process of law.

165.    Plaintiffs and all non-prohibited individuals have a right to purchase a firearm from an FFL and but for Defendants denying Plaintiffs their rights, Plaintiffs and all other similarly situated individuals would be allowed to purchase a firearm from an FFL.

166.    Additionally, Plaintiffs are not prohibited persons and the Defendants should be immediately enjoined from denying Plaintiffs and all similarly situated individuals their Second Amendment rights.

167.    Plaintiffs also request their attorneys' fees and costs be awarded to Plaintiffs and request any other relief that they may be entitled to.

## COUNT III - (DECLARATORY JUDGMENT)

168.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if set forth herein.

169.    The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. 2201(a).

170.    Absent a declaratory judgment, there is a substantial likelihood that Plaintiffs will suffer irreparable injury in the future.

171.    There is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

172.     This Court possesses an independent basis for jurisdiction over the parties.

173.     A judgment declaring regarding the complained about policies will serve a useful purpose in clarifying and settling the legal relations in issue and will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.

174.     Defendants' laws, customs, practices and policies violates the Second Amendment to the United States Constitution, the Fifth Amendment to the United States Constitution and applicable statutory law, facially and as applied against the Plaintiffs in this action, damaging them. Plaintiffs are therefore entitled to a declaration declaring such laws, customs, policies, and practices unconstitutional.

## COUNT IV – VIOLATIONS OF PLAINTIFFS' DUE PROCESS RIGHTS

175.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if set forth herein.

176.     The Fifth Amendment to the United States Constitution says to the federal government that no one shall be "deprived of life, liberty or property without due process of law."

177.     In determining the amount of process due, the court should weigh three factors: 1) The interests of the individual in retaining their property and the

injury threatened by the official action; 2) The risk of error through the procedures used and probable value, if any, of additional or substitute procedural safeguards; 3) The costs and administrative burden of the additional process, and the interests of the government in efficient adjudication. *See Mathews v. Eldridge*, 424 U.S. 319 (1976).

178.     Plaintiffs have a protected property interest in their respective firearms, NFA stamps and NFA items.

179.     Plaintiffs have a protected liberty interest at stake because the process at issue implicates their Second Amendment rights and an additional liberty interest based on the stigma plus test as described below.

180.     In *Wisconsin v. Constantineau,* the Supreme Court held that a liberty interest may be implicated "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971).

181.     This holding has come to be known as the "stigma-plus test." *See Hart v. Parks,* 450 F.3d 1059, 1070 (9th Cir.2006). ("the plaintiff must show that the injury to reputation *caused* the denial of a federally protected right")

182.     Here, Plaintiffs can show they survive the stigma-plus test because they have suffered harm due to their erroneous denials by the federal government because law enforcement, firearms dealers, potential employers and other members of the community now believe they are prohibited from owning

a firearm due to criminal activity.  Thus, they survive the stigma portion of the test.

183.     Plaintiffs survive the plus portion of this test because Plaintiffs have had the alteration or extinguishment of "a right or status previously recognized by state law" i.e. their right to own and purchase firearms and/or NFA items.

184.     Thus, Plaintiffs meet the stigma-plus test and have an additional liberty interest at stake based on these grounds.

185.     As discussed above Plaintiffs have been erroneously determined to be prohibited from owning a firearm or NFA item and have no means to appeal their denial because of Defendants decision to no longer process NICS appeals.

186.     In *Humphries v. County of Los Angeles*, 554 F. 3d 1170 - Court of Appeals, (9th Circuit 2008), the Ninth Circuit concluded that California's database of "reports of suspected child abuse and severe neglect," known as the Child Abuse Central Index or CACI. CAL. PENAL CODE § 11170(a)(2) violated Due Process because it was extremely difficult to remove one's name from the registry even if a person could prove they had been erroneously placed on the Index.

187.     The Second Circuit found a due process violation in similar circumstances in *Valmonte v. Bane* 18 F.3d 992 (2d Cir. 1994).

188.     Here, Plaintiffs' due process claim is even greater because they have no means to demonstrate they are not a prohibited person other than filing this lawsuit.

189.     Plaintiffs have both procedural and substantive due process rights. Plaintiffs have had their procedural due process rights violated in that they have been unlawfully denied firearms transactions and the FBI will not process their appeals.

190.     This violation could be easily corrected if Defendants were to start processing appeals again.

191.     For the above reasons, Plaintiffs request this Court find that Defendants have violated their Due Process rights.

**WHEREFORE**, Plaintiffs respectfully request that the Court:

(1) Order Defendants to correct their records on Plaintiffs to reflect that they are not forbidden to purchase, receive, or possess a firearm;

(2) Order that Defendants allow the transfer of the firearm;

(3) Order Defendants to issue Plaintiffs a UPIN;

(4) Declaratory relief to find that Defendants conduct violate applicable statutory law, the Fifth Amendment and the Second Amendment;

(5) Find that suppressors are in common use by law abiding citizens for lawful purposes;

(6) Injunctive relief against Defendants' conduct which violates applicable statutory law, the Fifth Amendment and the Second Amendment; and

(7) That Plaintiffs be awarded their costs and attorneys' fees and any and all other relief they are entitled to.

Dated: July 1st, 2018.

Respectfully Submitted,


/s/ Stephen D. Stamboulieh
Stephen D. Stamboulieh
Stamboulieh Law, PLLC
P.O. Box 4008
Madison, MS  39130
(601) 852-3440
stephen@sdslaw.us
DC District Court Bar# MS0009
Counsel for Plaintiffs


Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com
* Admitted pro hac vice