IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ERROLL ALEXANDER EATON, GARY JAMES LECOMTE, and JUSTIN LANE BARGERON<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, et al.<br><br>Defendants. | ) Civil Action No.: <u>18-1336-TSC</u><br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

---

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

**COME NOW** Errol Alexander Eaton, Gary James LeComte, and Justin Lane Bargeron ("Plaintiffs"), by and through undersigned counsel, and for their Memorandum in Support of their Motion for Summary Judgment, state as follows:

**BACKGROUND**

This case began with five plaintiffs (Daniel A. Umbert, Troy Brent Chodosh, Errol Alexander Eaton, Chase W. Bickel, and Gary James LeComte). *See* Complaint, ECF #1. Three additional plaintiffs were added in the First Amended Complaint (Justin Lane Bargeron, Kevin Franscisco Borquez and Charles Edward Stewart). *See* First Amended Complaint, ECF #6. The thrust of the allegations was that the Federal Bureau of Investigations was erroneously denying the Plaintiffs their firearm purchases from Federal Firearms Licensees ("FFL").

As related in this Court's September 11, 2019 Memorandum Opinion, "[a]fter Plaintiffs filed the Amended Complaint, the FBI determined that [Plaintiffs] Chodosh, Bickel

and Stewart were eligible to obtain firearms…" *See* ECF #21, p.7.  As such, Chodosh, Bickel and Stewart were dismissed from the case. *Id.* at p. 16.  Mr. Borquez was notified on May 8, 2019 that the FBI was "able to determine [he is] eligible to possess or receive a firearm" and approved transaction NTN: 100XKCZYZ. *See* ECF #19-1.  On March 13, 2020, Mr. Borquez voluntarily dismissed himself from the case.  *See* ECF #34.  On November 20, 2020, Mr. Umbert voluntarily dismissed himself from the case.  *See* ECF #40.  As such, from those original eight plaintiffs, only three remain: Eaton, LeComte and Bargeron.

## I.   <u>Summary Judgment Standard</u>

Fed. R. Civ. P. 56(a) states  that "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law[]", then summary judgment is appropriate.  Plaintiffs bear the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Wilmina Shipping AS v. United States Dep't of Homeland Sec.*, 75 F. Supp. 3d 163, 167 (D.D.C. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)) (internal quotation marks omitted). "To defeat summary judgment, the non-moving party must 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (internal quotation marks omitted).

"The existence of a factual dispute is insufficient to preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is 'genuine' only if a reasonable fact-finder could find for the non-moving party; a fact is only 'material' if it is capable of affecting the outcome of the litigation… In assessing a party's motion, the court must 'view the facts and draw reasonable inferences 'in the light most

favorable to the party opposing the summary judgment motion.”” *Wilmina Shipping AS*, 75 F. Supp. 3d at 167 (citations omitted).

**II.    Applicable Law**

18 U.S.C. §922(g)(1) provides that:

> “It shall be unlawful for any person-- (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
>
> ***
>
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. §921(a)(20) provides that:

> The term “crime punishable by imprisonment for a term exceeding one year” does not include—
>
> (A) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or
> (B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.
>
> What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. **Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.** (emphasis added).

For firearms subject to the National Firearms Act’s provisions on registration and taxing, 26 U.S.C. § 5812 provides that:

> (a) Application. A firearm shall not be transferred unless (1) the transferor of the firearm has filed with the Secretary a written application, in duplicate, for the transfer and registration of the firearm to the transferee on the application form prescribed by the Secretary; (2) any tax payable on the transfer is paid as evidenced by the proper stamp affixed to the original application form; (3) the transferee is identified in the application form in such manner as the Secretary may by regulations prescribe, except that, if such person is an individual, the identification must include his fingerprints and his photograph; (4) the

3

transferor of the firearm is identified in the application form in such manner as the Secretary may by regulations prescribe; (5) the firearm is identified in the application form in such manner as the Secretary may by regulations prescribe; and (6) the application form shows that the Secretary has approved the transfer and the registration of the firearm to the transferee. Applications shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of law.

(b) Transfer of possession. The transferee of a firearm shall not take possession of the firearm unless the Secretary has approved the transfer and registration of the firearm to the transferee as required by subsection (a) of this section.

Firearms subject to the National Firearms Act are defined in 26 U.S.C. § 5845:

(1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) any silencer (as defined in section 921 of title 18, United States Code); and (8) a destructive device.

The Gun Control Act (GCA), 18 U.S.C. § 921(a)(3), independently defines silencer (which is commonly referred to as a suppressor) as a "firearm."  It defines "firearm" as:

(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

Finally, 18 U.S.C. § 925A provides that:

Any person denied a firearm pursuant to subsection (s) or (t) of section 922—

(1) due to the provision of erroneous information relating to the person by any State or political subdivision thereof, or by the national instant criminal background check system established under section 103 of the Brady Handgun Violence Prevention Act; or

(2) who was not prohibited from receipt of a firearm pursuant to subsection (g) or (n) of section 922,

4

may bring an action against the State or political subdivision responsible for providing the erroneous information, or responsible for denying the transfer, or against the United States, as the case may be, for an order directing that the erroneous information be corrected or that the transfer be approved, as the case may be. In any action under this section, the court, in its discretion, may allow the prevailing party a reasonable attorney's fee as part of the costs.

## III.   Individual Plaintiffs

### A.   Plaintiff Erroll Alexander Eaton

Eaton applied to the ATF on a Form 4 for a suppressor.  He filled out all the required paperwork and submitted his tax payment as required.  In May 2018, Eaton's application was "disapproved by ATF based on the FBI reporting a final status of 'open' on the required background check after 88 days and have not received information back on the final disposition of potentially prohibiting information."  NTN 100J3SDH4 was assigned to Eaton. *See* Exhibit "1".

For background, Eaton was found guilty of the charges of Possession of Marijuana in a Motor vehicle and Possession of False Identification on May 15, 2003.  The matter was styled *State of Mississippi v. Erroll Alexander Eaton*, in the Municipal Court of the City of Starkville, Cause Nos. 03-2329 and 03-2331. On July 10, 2008, the municipal court granted Eaton's motion to expunge and restored Eaton "in the contemplation of the law, to the status he occupied before he was arrested on these charges and the affidavit was filed against him."  *See* Exhibit "2"[1].

Eaton was also arrested on July 1, 2005 in Denver County, Colorado for disturbing the peace[2] and plead guilty. *See* Exhibit "3".  This was an arrest at Red Rocks Amphitheater in

---

[1] Certain redactions were made to this document as it contained the social security number of Eaton.  If it is necessary to provide unredacted copies, Eaton will do so under seal with approval of this Court.

[2] And also false information and trespass, neither of which is a prohibiting factor.

Colorado after he ran onto the stage during a concert.  It had nothing to do with domestic violence.  On May 11, 2021, Eaton had his Colorado matter "sealed" pursuant to Colorado law.  *See* Exhibit "4".

The Defendants, through discovery, provided information claiming they don't know if "CRS 38-89"[3] "meet, possible meet or does not meet the force or attempted use of physical force or threatened use of a deadly weapon per 922(g)(9)."  *See* Exhibit "5". The Defendants leave out the rest of the definition, found in 18 U.S.C. § 921(a)(33), which provides the required elements of the charge: "… committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim."  *See* 18 U.S.C. § 921(a)(33).

Despite this being a charge of disturbing the peace, the Defendants are treating it like a domestic violence conviction, which <u>is</u> a prohibiting conviction under federal law.  *See* 18 § U.S.C. § 922(g)(9).  Like in *Ross v. Fed. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 903 F. Supp. 2d 333, 340 (D. Md. 2012), "[t]he record in this case is totally silent about the nature of the assault, who the alleged victim of the assault was, and what her relationship was with Ross. In other words, there is nothing to suggest that Ross used or attempted to use physical force against a female with whom he shared a child, with whom he had cohabited as a spouse, or that he had a relationship with the 'victim' akin to that of a spouse, parent or guardian. An assault on a girlfriend, for example, much less a stranger, would not be disqualifying."

---

[3] CRS 38-39 does not exist.  What Defendants probably mean is a Denver County ordinance, found at http://denver-co.elaws.us/code/coor_ch38_artiv_div1_sec38-89.

However, notwithstanding the underlying offense is not a MCDV because it doesn't meet the elements of MCDV under section 921(a)(33),  it is more importantly not an MCDV because the violation was over an ordinance and not a "Federal, State, or Tribal law" as required under 921(a)(33).  *See United States v. Pauler*, 857 F.3d 1073, 1078 (10th Cir. 2017) ("We interpret 'State' to have the same meaning in § 921(a)(33) that it has throughout the rest of §§ 921 and 922 and therefore conclude that 'a misdemeanor under Federal, State, or Tribal law' does not include a violation of a municipal ordinance. In these sections, when Congress refers only to 'State' law, it does not also include the laws of a state's political subdivisions."); *United States v. Enick*, No. 2:17-cr-00013-BLW, 2017 U.S. Dist. LEXIS 89140, at *4 (D. Idaho June 9, 2017) ("Under the plain language of § 921 and § 922(g)(9), a conviction under a municipal ordinance cannot serve as a predicate offense for the purposes of § 922(g)(9)").  As such, the Defendants misapprehended what Eaton was arrested for, and thus, erroneously delayed/denied his transfer for a crime that, as a matter of law, cannot serve as a prohibition.

As Eaton's first criminal convictions were expunged, they are a legal nullity and cannot serve as a basis to deny Eaton his transfer.  And because Eaton's other Colorado charges are not prohibiting factors, they cannot be used as a basis to deny Eaton his transfer.

Through the course of this litigation, Plaintiff Eaton has tried to have his records corrected with the FBI, but to no avail.  Plaintiff Eaton was advised by the Defendants that: "NICS advises that he is still potentially prohibited for both the 2005 and 2003 arrests/convictions. They would issue a delay but not a denial for any future transactions. The FFL could therefore release the firearm for the transaction three working days after the delay notification, if they chose to complete the transaction[]", however, because the transaction at issue is for a suppressor (an item regulated by the NFA), there is no "three working days"

exemption, and Eaton cannot acquire his suppressor even though he will be merely "delayed" by the FBI.  This, in essence, is a constructive denial for all NFA firearms in a "delay" status.

And like in *Ross*, the Defendants are "acting ultra vires when it informed Ross that, although it was 'unable to obtain complete disposition information' about the 1965 arrest, the 'potentially prohibitive' criteria would subject his 'future firearms transactions . . . to a delay.' In doing so, the NICS Section erroneously shifted the burden to Ross to contact the North Carolina State Bureau of Investigation—the agency that presumably possessed the 'potentially prohibitive criteria'—and required him to submit 'appropriate documentation' and/or update his 'record.' Nothing in the regulations supports the NICS Section's position that the prospective transferee must disprove the existence of a potentially disqualifying criminal record to avoid all future delays." *Ross*, at 341.

Because the Defendants have no information to the contrary, the Defendants "should have told [ATF] to 'Proceed' with the transaction, since the available information 'did not demonstrate that the transfer of the firearm would violate federal or state law.' 28 C.F.R. § 25.2." *Ross*, at 341.

### B.  Plaintiff Gary James LeComte

LeComte was denied a transfer of a firearm in June 2015 when he went to retrieve a firearm that he had pawned and then wanted to reclaim from the pawn shop.  The FBI provided NTN 2YCWZXK.  LeComte filed an appeal and the FBI responded with the attached letter saying he was a prohibited person.  *See* Exhibit "6."  On April 10, 2018, LeComte received correspondence from the FBI stating that the FBI had resolved some prohibitory information in his record, however, two potential prohibitor(s) still remained.  The FBI then shifted the burden to LeComte to research and provide records to the FBI.

The FBI listed two arrests:  One with the U.S. Yosemite National Park Service for an arrest on January 5, 1975 and one with the Santa Cruz County Sheriff's Office for an arrest on January 6, 1975.  *Id.*   The FBI then directed LeComte to provide "**court documentation containing the final disposition, level of conviction, and/or convicting statute and subsection; police report or court documentation containing victim information.**" *Id.* Further, it instructed LeComte that once he has "obtained **ALL** of the requested documentation listed above, please submit it to our office.  Please be advised, a 'no record found' document is not sufficient documentation and should not be provided." *Id.*

For background, LeComte was arrested on or about January 5, 1975 by a National Park Service Park Ranger for malicious mischief – writing on a public restroom.  LeComte was convicted of malicious mischief and to his recollection, was sentenced to ninety days probation and had to pay a fifty ($50) dollar fine to repaint the bathroom.  This was not a felony conviction and there do not appear to be any documents that can be found either by LeComte or by the Defendants.  It is also unknown as to why the FBI believes this to be a prohibiting factor.

Then, on January 6, 1975, LeComte was arrested by Capitola Police Department who arrested LeComte on a warrant from Santa Cruz County Sheriff's Office for an assault charge. LeComte was convicted of a misdemeanor battery after it was reduced from a felony assault. However, the court provided a document that it purged its documents and thus, does not have the documents to demonstrate the facts of the case.  As such, the FBI believes this is "potentially prohibiting" and will not clear Mr. LeComte, despite there being no records that this arrest was a Misdemeanor Crime of Domestic Violence (MCDV).  In fact, it was not a prohibiting MCDV, but a fist fight with a male friend at the time.  *See* Declaration of LeComte, Exhibit "7."  As Mr. LeComte states, "[a]t no point in [his] life was [he] a 'current or former

spouse, parent or guardian' of Jim…" (the individual he fought with). Neither did he share a child with Jim. And they never cohabitated as a "spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian…" *Id.* Mr. LeComte additionally provided documents to the FBI. *Id.* Mr. LeComte's wife, Vicki LeComte, also provided a declaration outlining how long she has known her current husband (since 1969) and that Mr. LeComte was never married to Jim, that Jim and Gary did not have a child together, and that they never cohabitated together. *See* Declaration of Vicki LeComte, Exhibit "8."

The FBI has improperly shifted its burden to LeComte to prove he is not a prohibited person with records that do not appear to exist, contrary to the FBI's burden of researching and finding these records on its own. *See Ross v. Fed. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 903 F. Supp. 2d 333, 341 (D. Md. 2012). Because the FBI has no documentation supporting its belief that Plaintiff LeComte is a prohibited person, the FBI has erroneously denied LeComte's rights to have his firearm returned to him and to correct his record.

And the arguments in *Ross* apply completely here. There is no information that the Defendants have which would demonstrate that returning Mr. LeComte's firearm would place him in violation of either federal or state law (*Ross*, at 341), but instead, the Defendants shift the burden to LeComte to prove he is not prohibited. This is akin to guilty until proven innocent, and what is a plaintiff to do when the courts do not possess the records which would satisfy Defendants any longer? Surely this cannot serve as a lifetime ban on the exercise of a Second Amendment right. Plaintiff LeComte is not a prohibited person and the Defendants "should have told [the dealer] to 'Proceed' with the transaction, since the available information 'did not demonstrate that the transfer of the firearm would violate federal or state law.' 28 C.F.R. § 25.2." *Ross*, at 341.

### C. **Plaintiff Justin Lane Bargeron**

Plaintiff Bargeron was denied a transfer of a firearm (a suppressor) in June 2018 when he filed his Form 4 to transfer a suppressor. The FBI utilized NICS and claimed that Bargeron failed the background check. The NTN assigned by the FBI is 100G1RNYM. Bargeron appealed the denial and was advised by the FBI that it does not process appeal requests "for the NFA background checks." *See* Exhibit "9". Plaintiff Bargeron was also denied the purchase of a rifle in December 2017, and was assigned NTN 100G49RNT.

For background, Plaintiff Bargeron received an open-ended plea disposition under Georgia's First Offender Act and was sentenced to ten (10) years of probation and a fine. *See* Exhibit "10". On September 23, 2016, a Petition for Discharge of defendant [Bargeron] (First Offender Act) was filed by the Assistant Chief Community Supervision Officer. *See* Exhibit "11." This document includes an "Order of Discharge" which states that Bargeron was "placed on probation on the 24th day of September, 2009 for a period of ten (10) years in accordance with the provision of [the Act] without an adjudication of guilt" and that Bargeron was "discharged without court adjudication of guilt" and that "this discharge shall completely exonerate the defendant of any criminal purpose" and that Bargeron "shall not be considered to have a criminal conviction." *Id.* It was signed by Judge John R. Turner of Bulloch County Superior Court.

The Defendants agree that this is not a prohibiting factor. *See* Exhibit "12", Defendants' Responses to Interrogatories, No. 8, page 6 ("On August 2, 2018, per OGC request, the LAT performed an additional review of the transaction. After review, an Order of Discharge was located that cleared DOA August 24, 2007 as prohibiting.")

However, the Defendants now believe Bargeron is a potentially prohibited person because "an arrest for DOA January 12, 1999 for the Felony level offense of Burglary was

listed on the criminal history record with no disposition." *See* Exhibit "12", No.8, page 6.  In

that interrogatory response, Defendants state that "a Legal Administrative Specialist with the

Legal Analysis Team researched to try and obtain disposition information… via fax."  *Id.*

Defendants tried the State Court, the Superior Court and the District Attorney.  The State

Court responded, "No record for this charge in state court, Defendant was 16 years old at the

time of the offense + case could have been adjudicated in juvenile or bound over to Superior

Juvenile Court." The Superior Court stated: "No record found.  Please contact the arresting

agency." And the District Attorney didn't respond.  Instead of locating any actual prohibiting

record, the Defendants claim that "the NICS Section has been unable to unable a disposition

(sic).  Based upon this, a potential prohibitor remains for Mr. Bargeron."  *Id.*

As discussed previously for Mr. Eaton and Mr. LeComte, this is again like *Ross v. Fed.*

*Bureau of Alcohol, Tobacco, Firearms & Explosives*, 903 F. Supp. 2d 333, 341 (D. Md. 2012).  In

*Ross*, the district court found that the defendant was improperly shifting the burden and that:

> [t]he regulations make clear that the burden falls on the NICS Section to
> conduct additional research "to determine whether the prospective transferee
> is disqualified from possessing a firearm by Federal or state law." 28 C.F.R. §
> 25.6(c)(1).

*Id.* at fn. 13.  So, we are left with the proposition that the Defendants have no records that

demonstrate that Bargeron is a prohibited person.  Instead, Defendants can't say he is a

prohibited person, so they treat him as a potential prohibited person.  Because there are no

records demonstrating he is a prohibited person, the FBI should approve his transfer and

correct his record to reflect that he is not a prohibited person.

### IV.   Plaintiffs are Trapped Between the FBI's and ATF's Dispute

For a regular firearm, like Mr. LeComte's and Mr. Bargeron's rifle, they must undergo

a NICS background check by the FBI before they are allowed to purchase a firearm from an

FFL.  It is illegal under federal law for a person to sell a firearm to a prohibited person.  In

some circumstances that are not applicable here, a person could purchase a firearm from a non-FFL without undergoing a NICS check.  Notwithstanding that, it is customary for private sellers to inquire as to whether a person is prohibited in order to avoid criminal liability. As such, it is virtually impossible to lawfully purchase a firearm if a person is deemed prohibited by the FBI even if the FBI is incorrect.

Individuals who wish to purchase suppressors or other NFA regulated items are required by federal law to file an application with the Bureau of Alcohol, Tobacco, Firearms and Explosives, who will then approve or deny the application for transfer of the NFA item. *See* 26 U.S.C. § 5812.   Suppressors are regulated under the NFA and defined as a "firearm." *See* 26 U.S.C. § 5845(7).  A suppressor is also defined as a "firearm" under the Gun Control Act. *See* 18 U.S.C. § 921(a)(3).

In order to purchase a suppressor, first it must be legal in the state where the plaintiff resides.  Eaton and Bargeron reside in states where suppressor ownership is legal as long as the ownership complies with federal law (i.e., approved by the ATF and registered in the National Firearms Registration and Transfer Record).  A prospective suppressor purchaser must then file an application on ATF Form 5320.4 (commonly referred to as a Form 4[4]), answer a number of questions regarding whether the person is a prohibited person, affix a photograph of themselves, and submit fingerprints to the ATF.

These applications can take anywhere from 7 months[5] to over a year to approve and transfer the suppressor (or other NFA-regulated firearm) to the applicant.  The FBI used to

---

[4] Form 4 is available on the ATF's website, found at: https://bit.ly/3Ab89qF (ATF website, last visited 10.1.2021).

[5] *See* Interrogatory Response No. 14 ("average processing time … is 7 months"). Exhibit "13".

conduct the background checks for the ATF with respect to a Form 4 application. Now, after the ATF and FBI argued back and forth as to which entity is supposed to conduct background checks for NFA items, the ATF appears to be conducting its own NICS check on prospective NFA applicants.

On June 19, 2018, ATF Deputy Assistant Director Curtis Gilbert sent a letter to the NICS Section Chief. *See* Exhibit "14." In this letter, Mr. Gilbert quotes to several CFR provisions for the proposition that the ATF was not delegated "any functions or responsibility of conducting background checks or maintaining a system of records under the Brady Act." *Id.* In the same letter, Mr. Gilbert outlines why FBI is responsible for conducting the appeals process which it "*formally* implemented." *Id.* (italics in original). Mr. Gilbert cites to 28 C.F.R. 25.2 for the definition of "appeal" and the formal appeals process under 28 C.F.R. 25.10, subsections (c) and (d) which dictate how the records should be challenged and who processes the challenge to inaccurate records. Subsection (d) appears to place the process squarely on the FBI. *See Id.* at p. 4.

Mr. Gilbert goes on to state, "[b]ased on the aforementioned and unambiguous statutory and regulatory authority, the FBI is the agency that **must** act on appeals that result from NICS denials. There is no legal mechanism – statutory or regulatory – through which ATF can process NICS appeals." *Id.* (emphasis in original). Mr. Gilbert further advises the FBI that its conduct "invites a likely successful challenge under the [APA]…" *Id.*

Almost a year later, on June 3, 2019, Kimberly J. Del Greco, the Deputy Assistant Director for Information Services Branch, CJIS Division of the FBI, responded to Mr. Gilbert. *See* Exhibit "15." Ms. Del Greco advised the ATF that the "position of the FBI that ATF NFA transfers do not fall within the purview of the NICS provisions of the [Brady Act]" and that "application and analysis of the NICS regulations … seems unnecessary." *Id.* Ms. Del

Greco then proceeds to tell Mr. Gilbert that "the processing of any ATF work[], to include NFA appeals by the  NICS Section, pursued due to the denial of a transfer based upon the results of a NICS background check, runs afoul of the Federal Appropriations laws and the Anti-Deficiency Acts.[]"  *Id.*  Ms. Del Greco then tells the ATF that it should promulgate its own appeal rules and that the FBI is not really doing the denying of NFA transfers, but merely "provides recommendations to the ATF based upon the results of a NICS background check…"  *Id.*  Finally, Ms. Del Greco advises that the "FBI will no longer make recommendations to the ATF as ATF checks should no longer be processed by the NICS Section."  *Id.*

In an email circulated among redacted FBI employees discussing NFA checks, an unnamed FBI employee related a call between the FBI employee and two ATF attorneys and "ODAG".  The FBI employee said that the "phone call didn't go any better than the last time." *See* Exhibit "16", Redacted letter.  The employee discussed that the FBI viewed "us performing the ATF work as a risk." That employee kept information from the ATF attendees on the call, because the employee wrote in the email, "What I didn't say was that our EAD directed that the work be given back to ATF within the next 60 days because that sounds ridiculous… there's no way the volume of work or a work process can be moved within 60 days.  It took us 4 months or more just to move appeals from NICS to BSS and that's under 1 leader!" *Id.* at p.4.  The email's author also stated "[redacted] from DOJ didn't say a word! Someone mentioned this would probably have to be resolved by DOJ." *Id.* at p.5.

In any event, the Plaintiffs, and all other similarly situated individuals are stuck in the middle of the agencies' dispute and cannot have their appeals properly adjudicated.  It does not matter to Plaintiffs which "Department of Justice" agency "fixes" their records; only that their records are corrected to show they are not prohibited persons and transfers approved.

But since the FBI already has the knowledge <u>and</u> experience in fixing records <u>and</u> maintains the system in which the records are found <u>and</u> completes backgrounds checks for millions of firearms every year, it seems logical that it would also process appeals for NFA.

There is no lawful way to transfer a suppressor to an individual without submitting the Form 4 and submitting to a background check by FBI NICS.  In other words, Plaintiffs Eaton and Bargeron could not purchase a suppressor from an individual without having to go through the process of filing all necessary forms with the ATF, waiting the unreasonable amount of time it takes to review the application, and receiving a background check through NICS, and then (hopefully) approval from ATF.

Now, with the current position of the FBI to completely bar any appeal for a disapproved NFA item based <u>solely</u> on a NICS background check, Plaintiffs Eaton and Bargeron (and all others similarly situated) are left with no remedy.  As such, this violates Plaintiffs Eaton's and Bargeron's (and all others similarly situated) due process rights.  Under 28 C.F.R. § 25.10, the FBI has an obligation to verify the record correction with the originating agency and take all necessary steps to correct the record in NICS.

As to LeComte, the FBI's failures to properly (and promptly) adjudicate firearm background appeals is an ongoing issue with the Defendants, and they have been on notice as early as May 8, 2016 when the case *Gregory Michael Ledet v. USA*, in the United States District Court for the District of Columbia, Civil Action No. 1:16-cv-00865-ABJ was filed.  Since that case, four others were filed: *Robert Boyd Rood v. USA*, in the United States District Court for the District of Columbia, Civil Action No. 1:17-cv-00839-KBJ; *Robert Earl Rowe v. USA*, in the United States District Court for the District of Columbia, Civil Action No. 1:16-cv-01510-APM; and *Charles Norfleet Hughes v. USA*, in the United States District Court for the District of Columbia, Civil Action No. 1:16-cv-01425-APM.

All the aforementioned cases were filed and then quickly the government defendant(s) "voluntarily" provided the relief sought in the actions. All five plaintiffs in those cases were granted their certificates to purchase their firearms. This essentially mooted those cases, yet it is apparent that the issues underlying the present action are evading review and are repeating day in and day out.

## V.    Plaintiffs' Due Process Rights Are Violated

Defendants' laws, customs, practices and policies violates the Second Amendment to the United States Constitution, the Fifth Amendment to the United States Constitution and applicable statutory law, facially and as applied against the Defendants in this action, damaging them. Plaintiffs are therefore entitled to a declaration declaring such laws, customs, policies, and practices unconstitutional.

The Fifth Amendment to the United States Constitution states that no one shall be 'deprived of life, liberty or property without due process of law." U.S. Const. amend. V. In determining the amount of process due, the court should weigh three factors: 1) The interests of the individual in retaining their property and the injury threatened by the official action; 2) The risk of error through the procedures used and probable value, if any, of additional or substitute procedural safeguards; 3) The costs and administrative burden of the additional process, and the interests of the government in efficient adjudication. *See Mathews v. Eldridge*, 424 U.S. 319 (1976).

Here, Mr. LeComte and Mr. Bargeron have a protected liberty interest in their right to own a firearm. This was established in *District of Columbia v. Heller*, 554 U.S. 570, 628, 128 S. Ct. 2783, 2817 (2008) when the Supreme Court found that the Second Amendment protects an individual right and that handgun possession is protected by the Second Amendment. The D.C. Appeals court has extended *Heller*'s reach to find that long guns (rifles and shotguns) are

protected arms. "All the requirements as applied to long guns, also affect the Second Amendment right." *Heller v. District of Columbia,* 670 F.3d 1244, 1255 (2011).

The Plaintiffs who also want suppressors, similarly, have a Second Amendment liberty interest in the possession of suppressors (which are also known as silencers). In *Heller v. District of Columbia*, 399 U.S. App. D.C. 314, 331, 670 F.3d 1244, 1261 (2011) the D.C. Court of Appeals evaluated the District Court of Columbia's ban on magazines which hold more than ten rounds and assault weapons. The Court found that both were "arms". Then, it found that in order to determine whether they received Second Amendment protection, the Court had to determine whether they were "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 399 U.S. App. D.C. 314 at 330.

It then found that both the prohibited magazines and assault weapons are in common use. In the case of AR-15s, the Court found that they were in common use because "1.6 million AR-15s alone have been manufactured since 1986." *Heller v. District of Columbia*, 399 U.S. App. D.C. 314, 331, 670 F.3d 1244, 1261 (2011). The Court then stated that it was unclear whether the arms at issue are typically used for lawful purposes such as self-defense or hunting. *Heller v. District of Columbia*, 399 U.S. App. D.C. 314 at 331. In the same way that magazines are arms, so are suppressors.

The National Firearms Act includes suppressors in the definition of "firearm." 26 U.S.C. § 5845(a). And in *United States v. Miller*, 307 U.S. 174 (1939), the Supreme Court recognized that the "Arms" the people had the right to keep and bear were not strictly limited to firearms but included "ordinary military equipment" such as ammunition, bayonets and iron ramrods fitted on the firearm's barrel, and other "proper accoutrements." 307 U.S. at 180-82. Although modern suppressors of the sort at issue here were invented long after the Second Amendment was ratified, the Amendment "'extends . . . to . . . arms . . . that were not in

existence at the time of the founding.'" *Caetano v. Massachusetts*, 577 U.S. 411, 136 S. Ct. 1027, 1027 (2016) (quoting *Heller*, 554 U.S. at 582).

*Heller* holds there is a presumption that arms are constitutionally protected, and the burden is on the government to rebut that presumption. "*Heller* emphasizes that 'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms.' *Heller*, 554 U.S. at 582. In other words, it identifies a presumption in favor of Second Amendment protection, which the State bears the initial burden of rebutting." *See New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 257 (2d Cir. 2015). Therefore, the burden in on the government to prove that suppressor are not protected by the Second Amendment.  Here, the government will not be able to do so because suppressors are, in fact, protected by the Second Amendment.

There are 2,042,719 suppressors owned by law abiding citizens through the National Firearms Act ("NFA") as of 2020.[6] And thus, far more than the amount that was needed for this Circuit to find AR-15s are in common use. And that is despite legal impediments to owning a silencer, including the National Firearms Act requirements—paying a $200 transfer tax, submitting a detailed application and fingerprints, and a multi months-long wait for the federal government to process the application. *See* 26 U.S.C. § 5811. Even arms that are far less common have been found to be protected.

In *Caetano v. Massachusetts*, 577 U.S. 411, 136 S. Ct. 1027, 1032-33 (2016), Justice Alito stated the following in his concurring opinion:

> "The more relevant statistic is that '[h]undreds of thousands of Tasers and stun guns have been sold to private citizens,' who it appears may lawfully possess them in 45 States. *People* v. *Yanna*, 297 Mich. App. 137, 144, 824 N. W. 2d 241, 245 (2012) (holding Michigan stun gun ban unconstitutional); see Volokh,

---

[6] *See* https://www.atf.gov/file/149886/download (Firearms Commerce in the United States, Annual Statistical Update 2020) (last viewed 10.1.2021).

Nonlethal Self-Defense, (Almost Entirely) Nonlethal Weapons, and the Rights To Keep and Bear Arms and Defend Life, 62 Stan. L. Rev. 199, 244 (2009) (citing stun gun bans in seven States); Wis. Stat. §941.295 (Supp. 2015) (amended Wisconsin law permitting stun gun possession); see also Brief in Opposition 11 (acknowledging that 'approximately 200,000 civilians owned stun guns' as of 2009)."

The Southern District of New York found nunchucks to be protected arms despite the Plaintiffs only being able to prove "64,890 nunchakus" in civilian hands. *Maloney v. Singas*, 351 F. Supp. 3d 222, 237-38 (E.D.N.Y. 2018).  A federal court even struck down a ban on flash suppressors, holding that such a ban violates the Second Amendment. *Murphy v. Guerrero*, No. 1:14-CV-00026, 2016 U.S. Dist. LEXIS 135684, *88 (D. N. Mar. I. Sep. 28, 2016) (unpublished). The court understood flash suppressors to be much like suppressors—an attachment to the front barrel "which attaches to the front barrel of the rifle [and] reduces noise and potentially increases accuracy." *Murphy*, at *65.

Suppressors are also typically used for lawful purposes[7] and are "very rarely used in criminal  shootings."[8]  Suppressors do not completely silence firearms or enable criminals

---

[7] Lawfully owned suppressors, approved by the ATF, are per se <u>only</u> lawfully owned because 1) criminals don't register their weapons and thus, the ATF will not have it registered in the national database (the NFRTR) as a lawfully owned suppressor and, 2) 26 U.S.C. § 5812 states that "Applications shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of law."  This leaves us with the proposition that over 2 million suppressors are lawfully owned for lawful purposes by law-abiding citizens, because if this was not the case, the ATF would not approve the transfer.

[8] See *Options to Reduce or Modify Firearms Regulations*, Ronald Turk, Associate Deputy Director of ATF, p.6.  https://s3.documentcloud.org/documents/3454608/Read-the-white-paper-on-firearms-regulations.pdf (last viewed 10.4.2021).  "In the past several years, opinions about silencers have changed across the United States.  Their use to reduce noise at shooting ranges and applications within the sporting and hunting industry are now well recognized.  At present, 42 states generally allow silencers to be used for sporting purposes.  The wide acceptance of silencers and corresponding changes in state laws have created substantial demand across the country… While DOJ and ATF have historically not supported removal of items from the NFA, the change in public acceptance of silencers arguably indicates that the reason for their inclusion in the NFA is archaic and historical reluctance to removing them from the NFA should be reevaluated.  ATF's experience with the criminal use of silencers also supports

using firearms to go undetected when they would otherwise be heard. *See* Nathan Rott, Debate Over Silencers: Hearing Protection or Public Safety Threat?, http://www.npr.org/2017/03/21/520953793/debate-over-silencers-hearing-protection-or-public-safety-threat (comparing the sound of four different firearms with and without a silencer); *see also*, David Kopel, The Hearing Protection Act and 'silencers', Washington Post, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2017/06/19/the-hearing-protection-act-and-silencers/. And the primary purpose of suppressors are for lawful purposes, including hunting,[9] which *Heller v. District of Columbia*, 399 U.S. App. D.C. 314, 331, 670 F.3d 1244, 1261 (2011) holds is part of the Second Amendment right, self-defense (the core right pursuant to *District of Columbia v. Heller*, 554 U.S. 570, 628, 128 S. Ct. 2783, 2817 (2008)) and target shooting which both the Seventh and Third Circuits have already found to be protected Second Amendment conduct. The right to self-defense "implies a corresponding right to acquire and maintain proficiency" with common weapons. *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) [hereinafter *Ezell I*].

A right to bear those weapons, after all, "wouldn't mean much without the training and practice that make [them] effective.'" *Drummond v. Robinson Twp.*, No. 20-1722, 2021 U.S. App. LEXIS 24511, at *12-13 (3d Cir. Aug. 17, 2021) *See also Ezell v. City of Chicago*, 651 F.3d

---

reassessing their inclusion in the NFA. On average in the past 10 years, ATF has only recommended 44 defendants a year for prosecution on silencer-related violations; of those, only approximately 6 of the defendants had prior felony convictions. Moreover, consistent with this low number of prosecution referrals, silencers are very rarely used in criminal shootings. Given the lack of criminality associated with silencers, it is reasonable to conclude that they should not be viewed as a threat to public safety necessitating NFA classification, and should be considered for reclassification under the GCA."

[9] The American Suppressor Association states that forty-two states allow civilian ownership of suppressors and of those forty-two, civilians may hunt with suppressors in forty states. Only eight states ban suppressors. *See* https://americansuppressorassociation.com/education/ (last accessed 10.4.2021).

684, 704 (7th Cir. 2011). Hearing loss is a risk when training at a range due to the noise emitted by gunfire. *See City and County of Denver v. Moore*, 504 P. 2d 367, 369 - Colo: Court of Appeals, 2nd Div. (1972) ("loss of hearing is the result of repeated monthly exposures at the firing range ... acoustic trauma which caused the injury was a result of exposure at the firing range once a month").

The American Speech-Language Hearing Association warns that "[e]xposure to noise greater than 140 dB can permanently damage hearing," and that "[a]lmost all firearms create noise that is over the 140-dB level." Michael Stewart, *Recreational Firearm Noise Exposure*, http://www.asha.org/public/hearing/Recreational-Firearm-Noise-Exposure/. As a result, people "can suffer a severe hearing loss with as little as one shot, if the conditions are right." *Id.* Other experts agree. Jay M. Bhatt, et al., *Epidemiology of Firearm and Other Noise Exposures in the United States*, The Laryngoscope at 5, *available at* http://onlinelibrary.wiley.com/doi/10.1002/lary.26540/epdf. Hearing loss from even limited firearm use is a regular occurrence, "especially during hunting season when hunters and bystanders may be exposed to rapid fire from big-bore rifles, shotguns, or pistols." Stewart, Recreational Firearm Noise Exposure. Even a ".22-caliber rifle can produce noise around 140 dB, while big-bore rifles and pistols can produce sound over 175 dB." *Id.* And firing guns at an indoor firing range, "where sounds can reverberate, or bounce off walls and other structures, can make noises louder and increase the risk of hearing loss." *Id.* Earplugs can be uncomfortable.  It is reported that twenty percent of firearms users never use hearing protection. Bhatt, at 5.  And "[h]unters are even less likely to wear hearing protection because they say they cannot hear approaching game or other noises." Stewart, Recreational Firearm Noise Exposure

Suppressors offer valuable benefits related to self-defense. Suppressors improve accuracy by reducing recoil and also reduce hearing loss and disorientation after firing, which could give a victim critical additional time to defend against an attack. *See* A.J. Peterman, Second Amendment Decision Rules, Non-Lethal Weapons, and Self-Defense, 97 Marq. L. Rev. 853, 892 n.221 (2014). During a self-defense situation, firing a firearm inside a home can deafen the shooter.  A suppressor allows for a homeowner to maintain his or her senses (and his or her hearing) while defending him- or herself.

There is a universal understanding that ""[e]xposure to noise greater than 140 dB [decibels] can permanently damage hearing,' according to Dr. Michael Stewart, Professor of Audiology at Central Michigan University. 'Almost all firearms create noise that is over the 140-dB level.'" Stephen P. Halbrook, Firearm Sound Moderators: Issues of Criminalization and the Second. Amendment, 46 Cumb. L. Rev. 33 (2015) at *1. "The National Institute for Occupational Safety and Health recommends that "hunters and shooters use double hearing protection every time a weapon is fired. Double protection involves wearing both earplugs and earmuffs." *Id.* But even the use of a single device makes it hard for a hunter to hear wildlife, and may inhibit one's ability to hear range commands, which can cause accidents." *Id* at *2. "A Finnish study on use of suppressors at rifle ranges showed that "[a]ll rifle suppressors reduced the shooter's exposure from the original 160 ± 3 decibels to below the EU risk limit 140 dB," and that "[i]f noise level decreases by 6 dB, distance to the neighbor can be halved."" *Id.* at *3 f.n, 17.

Suppressors are owned both here and all around the world for self-defense, hunting and target shooting. *See Id.* at *44-*46 (listing the legality of suppressors use in many European countries).  Here, all suppressors possessed under the NFA are for lawful use by law abiding citizens.  In order to own a suppressor under the NFA, one has to "register with the

government, obtain permission of law enforcement, submit fingerprints, and pay a $200 tax". *Id* at 3.  Target practice is why the first suppressor was designed. "The Maxim Silencer was developed to meet my personal desire to enjoy target practice without creating a disturbance," wrote Hiram Percy Maxim, inventor of the first successful firearm noise suppressor. *Id.*  Given the number of states that allow civilian ownership of suppressors and that allow for hunting while using suppressors, it "indicates a broad recognition of legitimate uses of suppressors not only to protect one's hearing, but also for such purposes as reduction of loud noise that may disturb others or spook game." *Id* at *3. (Footnotes omitted). ""The situations where a group of hunted animals react by fleeing to the sound of a firearm being discharged is so universal to be axiomatic."" *Id* at *3 fn 18.  Suppressors assist in this protected activity by reducing the decibels emitted by a firearm down to levels which do not hurt the ear.  Similarly, suppressors assist in hunting by protecting hearing and by dampening the report of a firearm so that game are not scared away. These are the primary purposes of suppressors, therefore their typical use is for lawful purposes and they receive Second Amendment protection. Therefore, Plaintiffs have a protected liberty interest in their ownership of a suppressor.

Plaintiffs have a protected liberty interest at stake because the process at issue implicates their Second Amendment rights and an additional liberty interest based on the stigma plus test as described below.  In *Wisconsin v. Constantineau,* the Supreme Court held that a liberty interest may be implicated "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). This holding has come to be known as the "stigma-plus test." *See Hart v. Parks,* 450 F.3d 1059, 1070 (9th Cir.2006). ("the plaintiff must show that the injury to reputation *caused* the denial of a federally protected right").  In the D.C. Circuit, "to prevail on [a stigma-plus] claim, appellants must show the government is 'the source of the

defamatory allegations' and the resulting stigma involved 'some tangible change of status vis-à-vis the government.'" *Aref v. Lynch*, 425 U.S. App. D.C. 274, 290 n.11, 833 F.3d 242, 258 (2016) (*quoting Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1108-09, 243 U.S. App. D.C. 354 (D.C. Cir. 1985)).

Here, Plaintiffs can show they survive the stigma-plus test because they have suffered harm due to their erroneous denials by the federal government because law enforcement, firearms dealers, potential employers and other members of the community now believe they are prohibited from owning a firearm due to criminal activity.  Thus, they survive the stigma portion of the test.

Plaintiffs survive the "plus" portion of this test because Plaintiffs have had the alteration or extinguishment of "a right or status previously recognized by state law" i.e. their right to own and purchase firearms and/or NFA items. There is no question that Plaintiffs' conduct does not prohibit them from owning or purchasing firearms.  However, with the Defendants shifting the burden to the Plaintiffs to prove they are not prohibited, all Plaintiffs have been stigmatized as prohibited persons.

Thus, Plaintiffs meet the stigma-plus test and have an additional liberty interest at stake based on these grounds.  As discussed above Plaintiffs have been erroneously determined to be prohibited from owning a firearm or an NFA firearm and have no means to appeal their denial because of Defendants' decision to either make them prove they are not prohibited based on the FBI's failure to properly conduct its research, or flatly denying them a right to correct erroneous government-controlled database information.

In *Humphries v. County of Los Angeles*, 554 F. 3d 1170 (9th Cir. 2008), the Ninth Circuit concluded that California's database of "reports of suspected child abuse and severe neglect," known as the Child Abuse Central Index or CACI. CAL. PENAL CODE § 11170(a)(2)

violated Due Process because it was extremely difficult to remove one's name from the registry even if a person could prove they had been erroneously placed on the Index. The Second Circuit found a due process violation in similar circumstances in *Valmonte v. Bane* 18 F.3d 992 (2d Cir. 1994).

Plaintiffs are also suffering a due process violation due to the amount of time which has elapsed since their applications. The Second Circuit has found that an "eighteen-month period" to appeal a denial of a firearm carry permit implicated due process and remanded an appeal for discovery. *Kuck v. Danaher*, 600 F.3d 159, 163 (2d Cir. 2010) "[W]e have recently held that deprivations may not be indefinite, particularly where delay cannot be attributed to any clear state interest or the risk of erroneous deprivation is significant." *Kuck v. Danaher*, 600 F.3d 159, 164 (2d Cir. 2010). Plaintiffs' claims are analogous. The government's delay in processing Plaintiffs' applications have resulted in an indefinite delay which violates due process. It is also an indefinite delay because the Defendants shifted the burden to the Plaintiffs to produce documents that do not exist or that Plaintiffs cannot physically obtain, and have held Plaintiffs' constitutional rights hostage to a process the Plaintiffs cannot complete. As shown above, there is no clear governmental interest, and the risk of erroneous deprivation is high. Thus, the Court should adopt the Second Circuit's reasoning and find that Defendant's conduct violates due process.

Here, Plaintiffs' due process rights have been violated because they have no means to demonstrate they are not a prohibited person other than filing this lawsuit. Plaintiffs have both procedural and substantive due process rights. Plaintiffs have had their procedural due process rights violated in that they have been unlawfully denied firearms transactions and the FBI will not process their appeals. This violation could be easily corrected if Defendants were

ordered to properly adjudicate firearm denial appeals and to stop improperly shifting the burden to a plaintiff to prove something otherwise, as in the case of *Ross*.

Defendants' conduct also violates due process because their procedures have created an erroneous deprivation of a protected interest through the implementing procedures which have inadequate safeguards in place to prevent erroneous deprivations. "A fundamental requirement of due process is the opportunity to be heard. [] It is an opportunity which must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, (1965) (citation and quotation omitted). In this case, there was no (and still is no) meaningful opportunity for Plaintiffs to appeal their adverse determinations. All the Plaintiffs in this matter are victims of these defective procedures. Even the Defendants implicitly acknowledge that an appeals process is needed or else there would simply not be an appeals process. The probable value of additional or substitute procedural safeguards is great and only require the processing of appeals as Defendants should already be doing. A process which lacks an appeal process is devoid of due process and unconstitutional. *See Novin v. Fong*, No. 5:14-CV-1218-LHK, 2014 U.S. Dist. LEXIS 169671, at *24 (N.D. Cal. Dec. 8, 2014) ("A hearing … would have provided [him] with sufficient process related to the denial of his permit"). Amending the denial and appeals process to comport with due process would simply require that Defendants do what is required of them: process appeals timely and correctly. Pursuant to *Mathews v. Eldridge*, 424 U.S. 319 (1976), Plaintiffs are suffering an ongoing Due Process violation.

### VI.    Defendants Violate the APA by not Processing Plaintiffs' Appeals and Correcting Erroneous Information

The Defendants' actions are reviewable by this Court under 5 U.S.C. §§ 701, *et seq*. "The APA provides relief for a failure to act in [5 U.S.C.] § 706(1): 'The reviewing court shall

. . . compel agency action unlawfully withheld or unreasonably delayed.' *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62, 124 S. Ct. 2373, 2378 (2004)." "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Id.* at 2379. "The seminal case on § 706(1) actions is *Norton v. Southern Utah Wilderness Alliance* (*SUWA*), 542 U.S. 55, 124 S. Ct. 2373, 159 L. Ed. 2d 137 (2004). *SUWA* teaches that the only action a court may compel an agency to take under § 706(1) is discrete action that the agency has a duty to perform. 542 U.S. at 62-63. The legal duty must be 'ministerial or nondiscretionary' and must amount to 'a specific, unequivocal command.'" *W. Org. of Res. Councils v. Zinke*, 436 U.S. App. D.C. 236, 243, 892 F.3d 1234, 1241 (2018).

A discrete action is "specific agency decisions, such as rulemakings, orders, or denials" rather than a request to force agencies to enforce broad statutory mandates. *City of N.Y. v. United States DOD*, 913 F.3d 423, 431 (4th Cir. 2019). Here, Plaintiffs are challenging Defendants' failure to process their individual appeals. Therefore, the challenged conduct qualifies as discrete. "[T]he definition of 'agency action' is limited to those governmental acts that 'determin[e] rights and obligations.'" *City of N.Y. v. United States DOD*, 913 F.3d 423, 431 (4th Cir. 2019). Here, the governmental act at issue determines whether Plaintiffs can own firearms/suppressors. Therefore, a right is at issue and this prong is fulfilled.

Here, Defendants are required to process Plaintiffs' background checks pursuant to 18 U.S.C. §922(t) and 28 C.F.R. § 25.6.   And they are required to process appeals/correct erroneous records in 28 C.F.R. § 25.10. Therefore, Defendants have a legal duty to perform this act. Finally, conducting an appeal is a ministerial act. "The term ministerial 'connotes the execution of policy as distinct from its formulation,'" which would be a discretionary act. *Biscoe*, 738 F.2d at 1362, quoting *Elgin v. District of Columbia*, 337 F.2d 152,

154-55, 119 U.S. App. D.C. 116 (D.C. Cir. 1964). "Discretionary acts have . . . been defined as acts that require 'personal deliberation, decision and judgment,'" whereas "ministerial acts . . . generally constitute 'mere obedience to orders or performance of a duty in which the [municipal employee] has little or no choice.'" *Nealon*, 669 A.2d at 690, quoting 18 E. McQuillin, Municipal Corporations § 53.22.10, at 274 (3d ed. 1984) (alterations in original)" *Cherry v. District of Columbia*, 330 F. Supp. 3d 216, 228 (D.D.C. 2018).

Here, processing an appeal is a ministerial task because there is no discretion in deciding whether or not a person is prohibited from owning a firearm/suppressor. There are clear unambiguous guidelines which Defendants are required to follow and a person is either prohibited or is not prohibited based on those guidelines. Therefore, Plaintiffs have a viable claim under § 706(1). As Mr. Gilbert's correspondence, *supra*, advised, the FBI's conduct "invites a likely successful challenge under the [APA]…" And he is correct because the Defendants are failing in their duty to process appeals and correct erroneous information. This Court should find that Defendants violated the APA by not processing Plaintiffs appeals and correcting erroneous data despite having a legal duty to do so.

/

/

/

/

/

/

29

**<u>Conclusion</u>**

For the foregoing reasons, Plaintiffs pray that their Motion for Summary Judgment is granted, and that the Court orders Defendants to stop shifting the burden to Plaintiffs to prove a negative, process their appeals, correct their records, and transfer the firearms to the respective Plaintiffs.

Dated: October <u>15</u>, 2021.

Respectfully Submitted,

*/s/ Stephen D. Stamboulieh*                          Alan Alexander Beck
Stephen D. Stamboulieh                          2692 Harcourt Drive
Stamboulieh Law, PLLC                          San Diego, CA 92123
P.O. Box 428                          (619) 905-9105
Olive Branch, MS 38654                          DC District Court Bar# HI0001
(601) 852-3440                          Alan.alexander.beck@gmail.com
stephen@sdslaw.us
DC District Court Bar# MS0009                          Counsel for Plaintiffs

## **CERTIFICATE OF SERVICE**

      I, Stephen D. Stamboulieh, counsel for Plaintiffs, hereby certify that on this day, I have caused to be filed the foregoing document or pleading with the District Court's ECF system which sent a notice and a copy of the foregoing to all counsel of record.


      Dated:  October <u>15</u>, 2021


<u>/s/ <i>Stephen D. Stamboulieh</i></u>
Stephen D. Stamboulieh
